# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 24-cr-109-03 (DLF)** |
| | : | |
| **NORMAN MORRIS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons set forth below, the United States respectfully requests that the Court impose a Guidelines-compliant sentence of 240 months' imprisonment, to be followed by three years of supervised release.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Norman Morris stood trial before this Court beginning on May 27, 2025, on charges of Conspiracy to Distribute and Possess with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Phencyclidine (Count One) and Unlawful Distribution of Fentanyl (Count Nineteen). The Defendant was convicted on Count One; the jury was unable to reach a verdict on Count Nineteen. Draft PSR, ¶ 7.

The evidence at trial showed that the Defendant routinely distributed fentanyl outside the residence he shared with his mother. One regular customer of the Defendant's testified that the

---

[1] The facts in this section are drawn from the evidence presented at trial, the discovery produced to the Defendant, and the Draft Presentence Investigation Report (ECF No. 141, the "Draft PSR"). As of January 27, 2026, no final Presentence Investigation Report has been issued.

Defendant sold him fentanyl "pretty much daily" for an extended period. Tr. of May 28, 2025, at 203. Five of these instances were shown to the jury on video, dating from November 2023 to February 2024. On one occasion, February 26, 2024, this testifying customer was stopped by law enforcement in the minutes after his purchase of 2.5 grams of fentanyl from the Defendant, and law enforcement recovered the drugs.



*The Defendant selling fentanyl on February 26, 2024, to a witness who testified at trial*



*Fentanyl recovered from the Defendant's customer on February 26, 2024*

The trial evidence also showed that the Defendant was a willing participant in a broader PCP distribution conspiracy headed by co-defendant Lamont Langston. From November 2023 through February 2024, law enforcement conducted controlled purchases of PCP from co-defendant and co-conspirator Jamar Bennett that had been supplied by Langston. The Draft PSR correctly recounts that as early as November 2023, the Defendant and Bennett met with Langston outside of the Defendant's house to exchange PCP the night before a scheduled controlled PCP purchase. Draft PSR, ¶ 12.



*The Defendant, Jamar Bennett, and Lamont Langston exchanging PCP outside the Defendant's home on November 14, 2023*

The Defendant's involvement in the conspiracy escalated after Langston's arrest on February 25, 2024. On that date, the Defendant picked Langston up, and then about two hours later dropped Langston off on 57th St. NE just moments before Langston fled from a police cruiser. At the time, Langston had on his person a Glock with a machinegun conversion switch (which he threw to the ground during the pursuit) and nearly $10,000 in cash. In his nearby car, Langston had a water bottle containing PCP and a Draco AK-style pistol. Draft PSR, ¶ 14.

In the days after Langston's arrest, the Defendant spoke to Langston in a series of recorded jail calls, including one on February 27, 2024, in which Langston asked the Defendant to retrieve four eight-ounce bottles of PCP from co-defendant Kelvin Sanker's home at 3920 Burns Ct., SE in advance of an anticipated visit by legal authorities. The Defendant agreed, and shortly after midnight on February 29, 2024, the Defendant and Jamar Bennett traveled to Sanker's home, where the Defendant collected the PCP. Draft PSR, ¶ 16.



*The Defendant entering 3920 Burns Ct. SE at 12:45 a.m. on February 29, 2024*

The Draft PSR finds the Defendant to be accountable for 38 ounces of PCP, a conservative estimate that assumes the only amounts of PCP reasonably foreseeable to him as part of the conspiracy were the six ounces exchanged in front of his home and in his presence on November 14, 2023, and the 32 ounces he personally picked up from Kelvin Sanker on February 29, 2024. Draft PSR, ¶ 29.

Other drug trafficking, though not presented to the jury at trial, was properly found by the Draft PSR to be relevant conduct. On November 5, 2023, the Defendant was stopped by Prince George's County, Maryland law enforcement. A search of the Defendant's person and vehicle revealed approximately 56 grams of methamphetamine, 0.5 grams of cocaine base, and approximately 10 grams of fentanyl. Following his arrest, the Defendant's co-conspirator Kelvin Sanker arrived on the scene and took possession of the Defendant's vehicle. Draft PSR, ¶ 13.

Separately, during the execution of a search warrant at the Defendant's home, law enforcement recovered a box of ammunition from under the porch. The Defendant was prohibited

from possessing ammunition.



*Assorted magazines and ammunition found at the residence of the Defendant*

The Draft PSR finds the Defendant accountable for a total of 16.5 grams of fentanyl,[2] based on the five recorded transactions in front of the Defendant's home that were presented at trial, plus the 10 grams recovered the Defendant's car in November 2023 in Prince George's County, Maryland. The Defendant is also accountable for the 56 grams of methamphetamine and 0.5 grams of cocaine base that law enforcement found on his person and in his vehicle at the same time as the 10 grams of fentanyl. Draft PSR, ¶ 29.

## II.    LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal

---

[2] The Draft PSR lists the substance as "Fentanyl Analogue" rather than fentanyl. The Government believes that the correct substance is fentanyl.

conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;
2) the need for the sentence imposed –
   A) to reflect the serious of the offense, to promote respect for the law, and to provide just punishment for the offense;
   B) to afford adequate deterrence to criminal conduct;
   C) to protect the public from further crimes of the defendant; and
   D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3) the kinds of sentences available;
4) the kinds of sentence and the sentencing range established for –
   A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) issued by the Sentencing Commission . . . ; and
      ii) that . . . are in effect on the date the defendant is sentenced;
5) any pertinent policy statement –
   A) issued by the Sentencing Commission . . . and
   B) that . . . is in effect on the date the defendant is sentenced
6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
7) the need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 551 U.S. 338, 348

(2007).

### III.    GUIDELINES CALCULATION

The Draft PSR correctly calculates the Defendant's Offense Level (34) and Criminal History Category (VI).  Draft PSR ¶¶ 38, 48.  The Offense Level calculation is based on the minimum quantity of PCP that was foreseeable to the Defendant in the course of the conspiracy, the other narcotics possessed and trafficked by the Defendant, the possession of a dangerous weapon during the commission of the offense and foreseeable to the Defendant (a Glock converted to a machinegun and a semi-automatic Draco pistol), and the Defendant's obstruction of justice. Draft PSR, ¶¶ 29, 30, 33. And, as the Draft PSR and the Pre-Plea Criminal History Calculation (ECF No. 82) found, the Defendant qualifies as a Career Offender under U.S.S.G. §4B1.1 based on his previous drug felony convictions, resulting in a Criminal History Category of VI.

Because the Defendant did not accept responsibility prior to trial (and indeed still has not accepted responsibility), and because the Defendant has Criminal History points, no reduction in Offense Level is warranted under U.S.S.G. §§ 3E1.1 or 4C1.1.

The Defendant's Offense Level and Criminal History Category indicate a Guidelines sentencing range of 262 to 327 months; however, because the statutory maximum penalty for the offense of conviction is 20 years, the Guidelines range is 240 months (with no range). Draft PSR, ¶ 118, *see also* U.S.S.G. §5G1.1(a).

In the event the Court determines that the Defendant is not a Career Offender under U.S.S.G. §4B1.1, or wishes to apply his Non-Career Offender Guidelines, his Offense Level would remain 34 and his Criminal History Category would be III (Draft PSR, ¶ 46), resulting in a Guidelines sentencing range of 188 to 235 months, or approximately 15.5 to 19.5 years.

## IV.   ARGUMENT

Norman Morris is a career drug dealer who routinely sold fentanyl outside his mother's house and agreed to obstruct justice to advance a PCP distribution conspiracy. To date, after his conviction by a jury of his peers, he has not accepted responsibility or shown remorse for his illegal conduct. The Defendant's repeated disrespect for the law and his clear refusal to own up to the dangers of his narcotics trafficking demand a significant sentence of incarceration. Accordingly, and for the reasons discussed in more detail below, the Government sees no basis to deviate from the Guidelines-compliant sentence of 240 months' incarceration.

### 1.   The Nature, Circumstances, and Seriousness of the Offense

In the words of his co-conspirator Lamont Langston, the Defendant was "on the front lines" of a PCP conspiracy—in addition to the Defendant's daily drug dealing out of his home. Moreover, during the same period, the Defendant was stopped in PG County with a distribution-level quantity of methamphetamine (as well as a distribution-level quantity of fentanyl), and some cocaine base (otherwise known as crack cocaine) to boot.

The Defendant's conspiracy supplied PCP sufficient for hundreds if not thousands of doses of PCP, and the Defendant himself is accountable for a quantity of PCP (38 ounces, or just slightly over 1 kg) that would have earned him a mandatory minimum 10-year sentence had it been charged as such. PCP, even in small doses (5 mg to 10 mg) "may induce acute schizophrenia, including agitation, psychosis, audiovisual hallucinations, paranoid delusions, and catatonia. Doses greater than 10 mg usually result in coma." Bey T. & Patel A., *Phencyclidine Intoxication and Adverse Effects: A Clinical and Pharmacological Review of an Illicit Drug*, Cal. J. Emerg Med. 2007 Feb;8(1):9-14, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC2859735/.

The Defendant's fentanyl distribution was even more dangerous. The Drug Enforcement

Administration has identified 2 mg of fentanyl as a potentially lethal dose. Drug Enforcement Administration, *Facts About Fentanyl*, https://www.dea.gov/resources/facts-about-fentanyl. The lethality of fentanyl is reflected in nationwide statistics: roughly 107,543 people in this country died of drug overdoses in 2023. *See* CDC National Center for Health Statistics, *U.S. Overdose Deaths Decrease in 2023, First Time Since 2018*, *available at* https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2024/20240515.htm. Of these deaths, roughly 74,702 (or about 69% percent) involved synthetic opioids—primarily fentanyl. *Id.*

At trial, the Defendant's long-time customer testified that he purchased fentanyl from the Defendant on a near-daily basis, and video evidence submitted to the Court prior to trial shows instances matching this pattern of distribution with numerous other customers. The Defendant's customer testified about his struggles with the addiction fueled by the Defendant's narcotics.

Nor should this Court ignore the circumstances of at least one part of the Defendant's involvement in the PCP conspiracy: After Lamont Langston's arrest, when the Defendant knew of a criminal investigation into Langston and knew that Langston expected authorities to visit 3920 Burns Ct. SE, the Defendant agreed without hesitation to pick up four bottles of PCP from co-conspirator Kelvin Sanker at that location.

The nature and circumstances of the Defendant's conduct demand a lengthy sentence.

### 2. The Defendant's History and Characteristics

As the Draft PSR recites, the Defendant is 44 years old and has a long history with the law, as demonstrated by his Career Offender status under §4B1.1 of the Guidelines. The Defendant's Pretrial Services Report, indicates seven prior convictions, dozens of prior arrests, and nine prior bench warrants. The Defendant's prior convictions break down into two categories: (1) drug distribution offenses, and (2) violations of court orders. *See* Draft PSR ¶¶ 40–45.

The Defendant's prior drug convictions are for distribution, possession with intent to distribute, and attempt to do the same, of cocaine (charged in 1999, 2000, and 2006) and heroin (charged in 2006). The Defendant also has two prior convictions for crimes against the judicial process, including a felony under the Bail Reform Act and an Escape conviction. Notably, the Defendant's 2006 PWID cocaine offense was committed while on release for another offense. Draft PSR, ¶ 45. Although the Defendant does not have any convictions directly related to firearms possession or violent offenses, he is no stranger to serious criminal violations.

The Defendant's arrest history only reinforces the need for a significant sentence. In addition to other arrests for drug offenses (e.g., Draft PSR, ¶¶ 62, 65), theft (Draft PSR, ¶ 71), he also has an arrest for unregistered ammunition (Draft PSR, ¶ 72)—separate and apart from the substantial quantity of varied ammunition found at his home in March 2024—and threats of bodily harm (Draft PSR, ¶ 68).

Nor was the Defendant's involvement in this case some kind of aberration from an otherwise reformed and law-abiding citizen. Although the Defendant had been out of prison for some time prior to the instant offense, the Draft PSR and the evidence presented at trial demonstrate his drug-dealing was ongoing. The Defendant's customer testified that he was in contact with the Defendant regularly to purchase fentanyl, and the Defendant's November 2023 arrest in Prince George's County—when he was in possession of three separate forms of illegal narcotics—establish that he had not given up the drug trade. By the Defendant's own recounting in the Draft PSR, he was unemployed from 2019 until his arrest in 2024 (Draft PSR, ¶ 108), yet he maintained two Mercedes sports cars, and he gambled "on a daily basis since 2013." Draft PSR, ¶ 99.

The Defendant's history and characteristics portray an individual with contempt for the

law and disregard for public safety. His sentence should reflect this history.

### 3.  The Need for the Sentence Imposed

The Defendant has repeatedly reverted to drug dealing over the course of his life. Prior sentences do not seem to have deterred him from breaking the law, defying the courts, or assisting in the obstruction of justice. A stiff sentence is required to demonstrate to the Defendant that distribution of fentanyl, PCP, methamphetamine, and other narcotics is neither a legitimate profession nor a victimless crime. When stopped by Prince George's County police and found to be in possession of methamphetamine and fentanyl, the Defendant told officers, "I'm not worried about a little bit of dope." This attitude, coupled with the Defendant's refusal to accept responsibility for his offenses in this case, illustrates why he has continually and voluntarily returned to selling dangerous drugs. He should be deterred from doing so again.

The Government recognizes that it has represented to the Court that the Defendant's co-conspirator and co-defendant Lamont Langston is the most culpable member of the PCP conspiracy. The Government maintains this position and acknowledges that Langston was sentenced to 138 months, Jamar Bennett was sentenced to 121 months, and Kelvin Sanker was sentenced to 65 months.

Nonetheless, the Government is not aware of a basis to depart from its standard policy of seeking a Guidelines sentence in this instance. The factors giving rise to the Defendant's Guidelines sentencing range of 240 months speak for themselves: In particular, Defendant's consistent fentanyl dealing even in the days after his arrest for drug possession in Maryland, his serial recidivism, and his refusal to accept responsibility all speak to the need for a significant sentence of incarceration. The Defendant's case is unlike those of his co-defendants, who accepted responsibility for their offenses and in some cases have a less persistent criminal history.

## V.    <u>CONCLUSION</u>

For the reasons stated above, the Government respectfully requests that the Court impose a Guidelines sentence of 240 months of incarceration, followed by three years of supervised release.

Respectfully Submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    _/s/ Adam L.D. Stempel____ _____
Adam L.D. Stempel
Special Assistant United States Attorney
Peter V. Roman
Assistant United States Attorney